366 A.2d 1271
**In the Interest of James and John LaRUE, minors.**
**Appeal of Joanne LaRUE.**

Superior Court of Pennsylvania.

Argued April 12, 1976.

Decided Dec. 15, 1976.

**9.** See 9 Standard Pa. Practice § 164 (Rev.ed. 1962).

John W. Herold, Pittsburgh, for appellant.

Clifford C. Cooper, Asst. County Sol., Eric N. Anderson, Joseph A. Rieser, Jr., Joseph F. McDonough, Reed, Smith, Shaw & McClay, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is a child custody case. John and James LaRue were born on January 2, 1971. They lived with their mother, Joanne, until July 12, 1971, when she signed an entrustment agreement placing them in the custody of the Allegheny County Child Welfare Services. On November 10, 1971, CWS placed the twins with Dove and Allie Harp. On January 17, 1975, Joanne LaRue revoked her entrustment agreement and notified CWS that she wanted the twins returned to her care. CWS responded by filing a petition under the Juvenile Act, Act of Dec. 6, 1972, P.L. 1464, No. 333, 11 Pa.C.S. § 50–101 *et seq.* (Supp.1976), alleging that the twins were "deprived" within the meaning of the Act. Following a hearing on March 5, 1975, the lower court ordered that CWS retain custody and continue placement of the twins with the Harps; the court continued the case for six months to afford it an opportunity to review its order. This appeal followed.

I

The fundamental principle, from which all other principles in custody cases derive, is that a child should grow up as part of its natural family. The role of the State is to do everything possible to ensure that the family will be strong and wholesome.

Thus, the Juvenile Act, 11 Pa.C.S. § 50–101(b) provides:

(b) This act shall be interpreted and construed as to effectuate the following purposes:

(1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this act;

(2) Consistent with the protection of the public interest, to remove from children committing delinquent acts the consequences of criminal behavior, and to substitute therefor a program of supervision, care and rehabilitation;

(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety;

(4) To provide means through which the provisions of this act are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced.

The primacy that this statement of purposes assigns to the family reflects the emphasis we place on the individual. In our view, government does not exist for its own sake but to create and maintain a social order in which the abilities of every individual may be realized to their fullest extent. In such an order the family is one of the most important institutions. Within its shelter, more than anywhere else, we may find the love and security we all need.

Thus the courts have repeatedly acted to protect the family.

In *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922), the issue was the validity of a state statute forbidding the teaching of a foreign language to any child who had not successfully finished the eighth

224

grade. In holding the statute invalid, the Court said that parents have a right "within the liberty of the [Fourteenth] Amendment," *id.* at 400, 43 S.Ct. at 627, to have their children instructed in a foreign language. Liberty, said Mr. Justice McReynolds,

> denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399, 43 S.Ct. at 626.

In *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1924), the Court held invalid a state statute that required public school education of children aged eight to sixteen. The statute, said the Court,

> unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. . . . The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Id.* at 534–35, 45 S.Ct. at 573.

In *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), the Court referred to marriage and procreation as among "the basic civil rights of man." In *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), it said that the care of children is within "the private realm of family life which the state cannot enter." In *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Court held that an anticontraceptive statute

violated the right of marital privacy, and in *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), that a statute prohibiting interracial marriage was a denial of due process. In *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973), the Court held a woman's "right of privacy . . . broad enough to encompass [her] decision whether or not to terminate her pregnancy." In *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974), it held that a regulation requiring a pregnant teacher to take early leave was invalid as "acting to penalize [her] for deciding to bear a child."

None of this is to say that the State does not have any right to intrude upon the family. The conception of Roman law that the father is the sovereign of his family is gone—assuming we ever shared it. *See generally E. Bodenheimer, Jurisprudence* 18–19 (1974). Parents may not dispose of their children at will. The right to have and to raise children is coupled with a "high duty". *Pierce v. Society of Sisters, supra* 268 U.S. at 535, 45 S. Ct. 571. Too often this duty is ignored. Instead of a shelter where love and security may be found, the family becomes a Hell. No one who has seen what parents sometimes do to children will think this language too strong. *The Battered Child* (R. Heller and C. Kempe eds. 1968); *see also, V. Fontana, Somewhere a Child is Crying* (1973); *PLI, Effective Utilization of Psychiatric Evidence,* ch. 5 (Criminal Law and Urban Problems 1970).

Thus arises one of the most difficult problems in the law. On the one hand, the State has an interest in requiring parents to respect the duty they owe their children. *Roe v. Wade, supra.* On the other hand, in requiring that respect, the State must be cautious not to intrude upon the family to the point of weakening it as one of our most important institutions.

The way to resolve this problem is to impose restraints upon the State, not to prevent its officials from reacting

to a child's plight, but to prevent them from overreacting. No doubt one official will be sensitive and wise, but another will be a self-righteous prig; and that is the one we must guard against, for backed by the State, his power may overwhelm any parent.

■■ Of such restraints upon the State, the most important is the principle that a child may not be taken from its parents except upon proof of "clear necessity." *In re: Adoption of R. I.*, 468 Pa. 287, 361 A.2d 294 (filed July 6, 1976); *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 324 A.2d 562 (1974); *Rinker Appeal*, 180 Pa.Super. 143, 117 A.2d 780 (1955). In the present case, the lower court ignored this principle. Instead, it decided the case as it would the usual custody case, where the question is whether the mother or father should have the child. That is to say, the court awarded the twins to the foster parents, and denied custody to their mother, because it found that that was in the twins' "best interest." Lower court slip opinion at 13.

This was error. "Best interest" is a much less exacting standard than "clear necessity." "Best interest" is a general welfare standard. Thus, in deciding in the usual custody case whether the mother or father should have the child, the court will typically consider such matters as the size and location of the mother's home as compared with the father's, the mother's character as compared with the father's, the availability of educational and religious facilities, and the mother's financial resources as compared with the father's. To hold that the present case should be decided in this manner would destroy the primacy we have assigned the family, as seen both in the cases and the Juvenile Act. Accept "best interest" as the standard by which to decide whether a child may be taken from the family, and social workers and judges of strong religious convictions will disapprove of a family when the child does not attend Sunday School; other social workers and judges, because of a

family's social habits (the mother smokes marihuana; she lives with a man not her husband; the marriage is interracial); others, because of a family's economic status (the family is on welfare; it lives in a trailer; the husband is constantly changing jobs). Should this be thought an overstatement, consider such cases as *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976), and *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). *And see Janet D. v. Carros,* 240 Pa.Super. 291, 362 A.2d 1060 (1976).

This does not mean that in a given case the family in question might not merit disapproval; it might. However, that should not entitle a court to take away its child:

> It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. . . .

> . . . The welfare of many children might be served by taking them from their homes and placing them in what the officials consider a better home. But the Juvenile Court Law [now the Juvenile Act] was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

> *Rinker Appeal, supra,* 180 Pa.Super. at 148, 117 A.2d at 783.

It is to prevent such actions that our courts have insisted that a child may be taken from its parents only upon proof of "clear necessity," and not upon proof of what may be in the child's "best interest".

## II

The requirements that must be met before a child may be taken from its parents, are clearly set forth in the Juvenile Act.

### A

■ The proceeding to take a child from its family may commence in a variety of ways, as for example by a petition by a social welfare agency to have the child declared deprived, or by a petition for habeas corpus brought by the natural parents, or upon petition by the foster parents. *See Stapleton v. Dauphin County Child Care Service, supra.* Whatever the form of proceeding, however, the issue that the hearing judge must determine is whether the child is a "deprived" child within the meaning of the Juvenile Act.

In making this determination, the hearing judge is controlled by the provision of the Juvenile Act that a "deprived" child is one who:

(i) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; or (ii) has been placed for care or adoption in violation of law; or (iii) has been abandoned by his parents, guardian, or other custodian; or (iv) is without a parent, guardian, or legal custodian; or (v) while subject to compulsory school attendance is habitually and without justification truant from school.

11 Pa.C.S. § 50–102(4).

■ The burden of proof should be on the party asking that the child be taken from its parents, and before the hearing judge may find the child deprived, the evidence must be "clear and convincing." 11 Pa.C.S. § 50–320(c). Evidence should be received from all interested

parties, and the child should be represented by counsel, for its interests may be distinct from any other party's. *Stapleton v. Dauphin County Child Care Service, supra.* The judge should receive, and if necessary should seek out, evidence from objective, disinterested witnesses. *Cf. Gunter v. Gunter, supra.* His inquiry should be comprehensive and searching, and his conclusion as to whether the child is deprived should be supported by specific findings of fact and a full discussion of the evidence. *Cf. Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973).

## B

Let us suppose the hearing judge decides that a child who has been entrusted to foster parents is deprived. He should then determine what "disposition [is] best suited to the protection and physical, mental, and moral welfare of the child." 11 Pa.C.S. § 50–321. In making this determination, the judge should be guided by the legislative statement of purposes in the Juvenile Act. He should try "to provide for the care, protection, and wholesome mental and physical development" of the child, and at the same time he should try "[t]o preserve the unity of the family whenever possible." 11 Pa.C.S. § 50–101.

In a given case it may be that the attainment of these objectives will involve making a choice. Thus it may appear that to provide for the wholesome development of the child, the child should be taken from its family. If the hearing judge is led by the evidence to consider such a choice, he must act within the limits imposed both by the legislature, "separating the child from parents only when necessary," 11 Pa.C.S. § 50–101(b)(3), and by the cases, only on proof of "clear necessity," *In re: Adoption of R. I., supra; Stapleton v. Dauphin County Child Care Service, supra; Rinker Appeal, supra.*

In the present case it would not be surprising if on remand the hearing judge would find the twins deprived, and would be led by the evidence to believe that he must decide whether to take them from their mother. It is at this juncture that the factual history of the entrustment agreement might be particularly pertinent.

Both the possibility and the desirability of trying to "preserve the unity of the family" may be critically affected by the influence on the child, and also on its parents, of the passage of time. *See* the discussion in *Gunter v. Gunter, supra.* Many factors must be taken into account. Among them should be: the age and mental development of the child; the extent to which a relationship with its parents has been preserved, and the nature of that relationship; the extent to which a relationship with the child's foster parents has been established, and the degree to which that relationship has become like that of a natural family.

In this regard, the hearing judge may have to appraise the significance of the entrustment agreement. Judge HOFFMAN correctly suggests that in the present case CWS appears to have exploited the entrustment agreement to separate rather than to preserve the family. (Indeed, it is just such conduct that led to the expression of distrust, in Part I of this opinion of officials who, acting in what they perceive to be a child's "best interest," would take a child from its parents.) The judge should learn why the parents signed the entrustment agreement, and whether they understood what the consequences might be. The judge should also learn the manner in which the agreement has been administered. Questions such as these should be asked: Was there resort to the agreement because of pressing need, or because of the parents' disinterest in raising their child? While the child was entrusted to another, what efforts were made—by all concerned—to encourage and help the parents to resume, or to start, raising their child?

Such inquiry will enable the hearing judge to learn how much vitality the natural family retains; that determined, he may come to a surer decision on whether he should require the attempt to raise the child within the family, or entrust its care to someone else.

One cannot pretend that it will be easy to determine how much vitality the family retains. It may be done, however, if the hearing judge will always bear in mind the reason our law requires him to try to preserve the family. It is not to preserve a mere social form, or a convention from the past, but to provide our children a place of shelter and love, so that they may grow in freedom and strength. The measure of a family's vitality is its ability to perform this function.

█ Some of the questions a hearing judge should ask have already been suggested. Stated more generally, his inquiry should be to determine the source of the difficulties of the family whose child is before him. Do the family's difficulties come from within? Do the parents understand their "high duty" to their children? Can they be helped to understand? If they understand, do they have the personal resources to act upon their understanding? Or do the family's difficulties come from without? Has the family been overwhelmed by sickness? By economic problems? What are the chances of helping the family overcome such difficulties?

By adopting such an approach, the hearing judge may reasonably expect some degree of success in his difficult task. In one case, the judge may find that the natural family retains enough vitality to require the attempt to preserve it, in another, that as the child's personal history has evolved, it neither has nor can expect to have a natural family able to afford it the security and love it needs.

## C

Let us next suppose the hearing judge finds that a child who has been entrusted to foster parents is not de-

prived. Then what should the judge do? In approach-
ing this question, it will be convenient first to examine
the lower court's answer, as disclosed by its opinion.

1

■ The lower court said that it was unable to decide
whether the twins were deprived

> since a finding of deprivation is a "present finding"
> and cannot relate to the past or [be] projected to the
> future. The children are in a good home, doing well,
> and under no construction of the term deprived can
> this court find them deprived.

Slip opinion of lower court at 7.

This was error. The question before the lower court
was not whether the child was "in a good home, doing
well," but whether the child was a "deprived child" with-
in one of the definitions of the Juvenile Act. As has
been discussed, a fundamental purpose of the Act is
"[t]o preserve the unity of the family whenever possi-
ble." 11 Pa.C.S. § 50–101(b). The definitions of a "de-
prived child" are consistent with this purpose. Thus a
child may be "in a good home, doing well," but if that
home is not the home of the child's parents, the possibili-
ty may nevertheless arise that the child is "deprived."

[10] For example: if the child "has been abandoned
by his parents," 11 Pa.C.S. § 50–102(4)(iii), or "has
been placed for care or adoption in violation of law," 11
Pa.C.S. § 50–102(4)(ii), the fact that the child is in a
good home, doing well, will not preclude, or even be rele-
vant to, deciding whether the child is "deprived."

To consider the case at hand: Here, the question be-
fore the lower court was whether the twins were "de-
prived" in that they "[were] without proper parental
care or control, subsistence, education as required by
law, or other care or control necessary for [their] physi-
cal, mental, or emotional health, or morals." 11 Pa.C.S. §

50–102(4)(i). This question was not made inapplicable, or unanswerable, simply by virtue of the fact that pursuant to an entrustment agreement the twins were in a good home, doing well.

In order to decide whether a child is one who "is *without proper parental care or control*," the hearing judge must decide not only whether *at this moment* there is proper parental care or control. If that were all the judge had to decide, no child living with foster parents could ever be deprived; the reasoning would be that since the child was under the care of foster parents, it was "without" the care of its own parents. However, such a construction of the Juvenile Act would not only be strained but inconsistent with, and destructive of, the Act's fundamental purpose of preserving the unity of the family. The question, "*Is* [the child] without proper parental care or control?", includes two questions: "Is the child *at this moment* without proper parental care or control?"; and, if so, "Is such care or control *immediately available*?"

This is simply another illustration of the frequently encountered fact that to ask whether something *is* so may imply asking whether it *may be made* so. Consider the following two cases. First: The hearing judge finds that if he returns the child to the parents, the child will be beaten and starved. The judge may go on to find that the child "is without proper parental care," and therefore "deprived." *In re: Dale Henry DeSavage*, 241 Pa. Super. 174, 360 A.2d 237 (1976). In this regard, the lower court's belief that it could not look to the future was mistaken; it may have to look to the future. Second: The child's parents were hospitalized because of an automobile accident. While they were hospitalized, their child was, pursuant to an entrustment agreement, placed with foster parents. The parents now seek the return of their child. The hearing judge finds that if he returns the child to the parents, the child will be loved and nour-

ished. The judge may go on to find that although the child *is* without proper parental care, because it *is* with the foster, not natural, parents, nevertheless, proper parental care is *immediately available*. The judge must then go on to find that the child is *not* "deprived." For the judge to say that the child *is* "deprived" would be to say to the parents, "I know that if I give you your child, you will give it proper care; however, I'm not going to give you your child." This would be an exercise of judicial power, not reason. To state the proposition in abstract terms: The court may take Action A (refuse return of child), provided that Condition Z (no proper parental care) exists. This means that A is justified only if Z exists as a fact independent of the court. The court may not justify A by itself creating Z.

2

The foregoing having been said, it is now possible to answer the question, what should the hearing judge do, if he finds that a child who has been entrusted to foster parents is not deprived?[1]

 If the hearing judge finds that a child who has been entrusted to foster parents is not deprived, there can be no doubt as to what the judge must do: he must return the child to the parents. This conclusion is compelled by the statutory scheme of the Juvenile Act. As discussed in Parts I and II–A of this opinion, under the

---

1. Judge Hoffman says that "the Juvenile Act did not contemplate the use of entrustment agreements . . . ." Dissenting opinion in support of remand 244 Pa.Super. at 1287; also, 244 Pa.Super. at 1285. This seems very much like the lower court's statement that if a child is in a "good [foster] home, doing well" no finding of deprivation can be made. However, in the opinion of a majority of this court, the Juvenile Act did contemplate the use of entrustment agreements. As just discussed at some length in the course of examining the opinion of the lower court, the Act's definition of a "deprived child" includes both the case of a child with the parents and the case of a child who has been entrusted to foster parents. Since the Act is complete, it is not necessary "to fashion procedures and standards" not authorized by, and inconsistent with, the Act. Dissenting opinion in support of remand 244 Pa.Super. at 1287, 1288 n. 12.

Act and also under the cases—a child may be separated from the parents *only* when *both* of two conditions are satisfied: there is "clear and convincing" evidence that the child is "deprived;" and there is proof of "clear necessity" for separating the child from the parents.[2]

## III

Accordingly, the record is remanded with instructions that a new hearing be conducted consistent with this opinion. In addition, two further constraints are imposed: First, the hearing must be before another judge, who will come to the case fresh. And second, the hearing must proceed with utmost dispatch. If time heals, it also wounds. Final order must follow remand by no more than 90 days.

CERCONE, J., files a concurring opinion.

HOFFMAN, J., files a dissenting opinion.

PRICE, J., files a dissenting opinion in which VAN der VOORT, J., joins.

CERCONE, Judge (concurring):

Essentially, I agree with Judge Spaeth's position, expressed in his opinion in support of remand, that the Juvenile Act provides an adequate framework and set of standards for determining whether a child, consensually placed in a foster home, should be returned to a natural parent. Consequently, I agree that an entrustment agreement should not be used to shift the inquiry from

---

2. Judge Hoffman states that "[i]f the court determines that the child will not be deprived, then the court must determine whether there are, nevertheless, compelling reasons for continuing custody of the child with the foster parents." Dissenting opinion in support of remand 244 Pa.Super. at 1281. However, there is no reason that the foster parents' custody should be emphasized instead of the unity of the family, *i. e.*, the natural parents' custody. Nor is it apparent how "compelling reasons" differs from "clear necessity".

whether a child will be deprived if returned to a natural parent, to whether a child's better interests will be served if he stays in the foster home. Because I have so concluded, and because the court below manifestly used this latter improper standard in the instant case, I agree that this case should be remanded for a new hearing. I hasten to add, however, that on the facts thus far presented, I would have affirmed the lower court's decision had it employed the proper standard and reached the same results; and, I do not interpret the opinions of any of my colleagues to suggest the contrary result is proper. Furthermore, I reject any suggestion that a deprivation hearing should be employed as an *ad hoc* inquisition into the adequacy of the services provided by Child Welfare Services. At such a hearing it is irrelevant, for example, whether "more extensive efforts by CWS [could] have preserved the integrity of the family." Similarly, if the court has already determined that a child has been or will be deprived by being with the natural parent, the question of whether "the agreement [was] clearly necessary in order to protect the child from living in continuing conditions amounting to deprivation" is moot. [*Id.*]

I do not agree that the facts in this case or in others which have been before us justify the general condemnation of entrustment agreements.[1] Entrustment agreements do not "disrupt" the child-parent relationship; they merely *evidence* the fact that the parent has decided that the child's interests will best be served, temporarily, by placing him in the custody of CWS.[2] Entrustment

---

1. Interestingly, two of my colleagues disapprove of the lower court's use of a CWS file because it denied Miss LaRue the right to cross-examine those who prepared the file. Yet, my colleagues use a law review article [to wit, Levine, *Caveat Parens: A Demystification of the Child Protection System*, 35 U.Pitt.L. Rev. 1 (1973)] as though it were evidence. There is simply no evidence of record in the instant case that CWS used duress or overreached in executing the entrustment agreement with Miss LaRue. See also *In the Interest of Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976).

2. There is no evidence that CWS carries out its duties like an Orwellian big brother, either. In virtually all cases where a child

agreements, therefore, offer flexibility to the statutory scheme which requires a deprivation hearing if the natural parents do not consent to placing the child with CWS. Furthermore, since a finding of deprivation has the effect of stigmatizing the natural parent, very often a consensual entrustment of a child will be far less disruptive to the future of a parent-child relationship than a deprivation hearing would be.

Hence, I join Judge Spaeth in remanding for a new hearing where the court would employ the standards set forth in the Juvenile Act in determining whether custody of the children should remain with the foster parents or be returned to Miss LaRue.

HOFFMAN, Judge (dissenting):

This case presents an important question concerning the interests of a natural parent, the state, the foster parents, and the Commonwealth in a determination of custody. When a natural parent has relinquished the custody of a child to a social service agency, under an entrustment agreement, but there has never been a judicial declaration that the child is deprived,[1] what standard must the juvenile court employ in deciding whether the child should be returned to the natural parent? I would hold that the juvenile court must first determine whether or not the child will be deprived within the meaning of the Juvenile Act [2] if returned to the natural parent. If

comes to the attention of CWS, it is either through referral from agencies or institutions like the police or hospitals, and sometimes it is at the behest of the parents themselves.

1. The Juvenile Act defines a "deprived child" as one who: "(i) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals; or (ii) has been placed for care or adoption in violation of law; or (iii) has been abandoned by his parents, guardian, or other custodian; or (iv) is without a parent, guardian, or legal custodian; or (v) while subject to compulsory school attendance is habitually and without justification truant from school." Act of December 6, 1972, P.L. 1464, No. 333, § 1; 11 P.S. § 50–102(4).

2. Note 1, supra.

the court determines that the child would be deprived if returned to the natural parent, it must then determine what disposition is best suited to the protection and physical, mental, and moral welfare of the child as required by the Act.[3] If the court determines that the child will not be deprived, then the court must determine whether there are, nevertheless, compelling reasons for continuing custody of the child with the foster parents.

James and John LaRue were born on January 2, 1971. Joanne LaRue, the twins' mother, retained custody of James and John until July 12, 1971. Although the record is almost completely devoid of direct testimony regarding the circumstances surrounding appellant's decision to place the twins in the custody of Allegheny County Child Welfare Services ("CWS"),[4] the CWS deprivation petition stated that ". . . said children were referred to [CWS] on July 15, 197[1], by officials of Mercy Hospital who reported that said children were not receiving adequate care and supervision in their home. Said children were immediately taken to Zoar Home and after an Entrustment Agreement was signed by the mother, they were transferred to a [CWS] foster home." On November 10, 1971, CWS placed the twins in the home of Dove and Allie Harp, where they have remained until the present.

**3.** Act of December 6, 1972, P.L. 1464, No. 333, § 24; 11 P.S. § 50–321.

**4.** The lower court did not allow testimony regarding the facts and circumstances surrounding the appellant's decision to sign the entrustment agreement. However, it did rely extensively on facts contained in CWS's file, which was not admitted into evidence. This procedure alone would be reversible error because it deprived appellant of her rights of confrontation and cross-examination. See *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Wood v. Tucker,* 231 Pa.Super. 461, 463, 332 A.2d 191 (1974); *Commonwealth ex rel. Mathis v. Cooper,* 188 Pa.Super. 113, 146 A.2d 158 (1958); *Commonwealth ex rel. Balick v. Balick,* 172 Pa.Super. 196, 92 A.2d 703 (1952); *Commonwealth ex rel. Rubertucci v. Rubertucci,* 159 Pa.Super. 511, 49 A.2d 269 (1946); *Commonwealth ex rel. Oncay v. Oncay,* 153 Pa.Super. 569, 570, 34 A.2d 839 (1943).

On January 17, 1975, appellant revoked the entrustment agreement and notified CWS that she desired the return of her children. Because CWS felt that appellant was not able to provide adequate care for the twins, it filed a petition requesting the court to order the children "placed under the supervision of [CWS] with permission to place."

The lower court held a hearing on March 15, 1975, at which the following facts were adduced. Appellant is twenty-eight years old and has never been married. She presently resides with her three other children in a three-bedroom home in a residential community. The house is rented on a month to month basis, and is appellant's third residence in the past four years. The other children all attend school; one is in a special school for slow learners. Her caseworker, Dennis Noble, testified that when he visited the home "[t]he downstairs was pretty cold. . . . There was a broken window or door with a blanket hanging over it. The kitchen wasn't very clean and there were—I saw a couple of roaches on the walls and floor of the living room." In the bedroom intended for the twins, the plaster was falling from the ceiling.

Mr. Noble's testimony was primarily an explication of the position expressed by CWS in its petition: ". . . When arrangements were made for the mother to visit with said children at [CWS], there were times when the mother would not appear and when she would come to visit them, her visits with said children would be brief. It was seldom that the mother would visit for the full time allotted her. During these visits, the interaction between the mother and said children was poor. The mother has expressed a desire to have said children return to her home. [CWS] does not feel that the mother is capable of providing adequate care and supervision for said children as yet." Mr. Noble testified that while appellant was giving her other children adequate care, the

addition of the twins to the household would prove too great a burden. He referred to the fact that one of appellant's other children had been severely burned the previous December and still required treatment at the clinic twice a week.[5] He also claimed that appellant "has never really cared for younger children. Her mother was taking care of the other children when they were young. . . ."[6] Finally, Mr. Noble relied on a conversation he had with appellant on January 30, 1975. At that time, she told Mr. Noble that she had no real plans for the twins and that "Maybe I am not ready to have them back."

Appellant vigorously disputed Mr. Noble's assertion that she had never cared for her children when they were young. In this regard, it should be noted that Mr. Noble had been assigned to appellant's case only five weeks prior to the hearing, and had seen her on only two occasions. Appellant further testified that she loved her sons, and was afraid that if they were not returned soon, they would never consider her their mother. Finally, appellant testified that she visited the children once a month (the maximum allowed by CWS) during the four-year period, and did not miss more than three appointments.

Lynette Norton, the caseworker for the foster parents, testified that she sees the twins approximately once every two weeks and testified that they are in good health, well-groomed and well-behaved. She stated that the

5. The record reveals continuing attempts to imply negligence on appellant's part in connection with the accident. It occurred while appellant was in the home, but on a different floor. Mr. Noble was permitted to testify over objection, that a hospital social worker had said there was some question concerning whether appellant had acted promptly. He also testified that the hospital wanted to file an abuse report, but that appellant's social worker, Mrs. Gibson, was convinced the incident was purely accidental, and persuaded the hospital not to file the report.

6. There was also testimony that appellant's fifteen-year-old niece ran away on two occasions while she resided with appellant.

twins enjoy an excellent relationship with the foster parents and the Harp's two other foster children. Ms. Norton testified that the twins really do not know that appellant is their mother, although they were not upset or afraid when they met with her. She agreed with Mr. Noble's conclusion that the removal of the twins from the foster home to reside permanently with their mother would be harmful:

"Q. Did the children seem anxious to get back to Mrs. Harp after the visits?

"A. I think so.

"Q. Did you ever mention to the children about going and staying with their mother permanently?

"A. I think that would be upsetting to them. I wouldn't threaten a four-year-old with moving him out of his situation unless there was an eminent [sic] reality.

"Q. Did you ever inquire as to their feelings about moving them? About how they would like to go live with their mother or do you want to live with your mother?

"A. I have asked them how they enjoyed the visit and I haven't been able to elicit much of an intelligible response. These are only four-year-old children, and I haven't talked to them about how they would feel about returning home to her because I think that would frighten them if they would understand that at all." Ms. Norton also disputed appellant's claim that she visited the twins every month: "The record shows that visits were infrequent and since one a month is usually the maximum, I take that to imply once every several months."

The final witness was the foster mother, Mrs. Harp. She described the close relationship that she and her husband have with the twins. Mrs. Harp is not employed and stays with the children on a full-time basis. She stated that she would gladly adopt the children were she allowed to do so.

242

Appellant's counsel also sought to bring to the court's attention the completely inadequate efforts of CWS in attempting to reunite appellant with her children:

"[COUNSEL FOR MS. LARUE]: One of the things I wanted to bring out, Your Honor, is the fact that in past Ms. LaRue has had a number of caseworkers, and there has been no consistent effort on the part of Child Welfare to introduce my client to any kind of counseling. And I am suggesting that [CWS] bears the responsibility toward the parent and that the parent shouldn't have the responsibility of her own seeking the necessary counseling. And what I am asking is: In the future, is Ms. LaRue to anticipate from [CWS] the experience that she has had in the past which is occasional visits once a month; caseworkers leaving a month and two-months absence.

"THE COURT: I think I can take judicial notice of it. Yes, that's what she is going to experience because Child Welfare doesn't have the wherewithal; and once the child is out of the home, they are pretty much out of the picture in terms of trying to bring about some change in the situation unless there is a continued hearing where the Court has control of it and specific directions have been given. So, I don't think that [Mr. Noble] is going to be able to tell you anything more than whatever services they have given in the past, which is minimal or not at all."

The lower court noted, "[t]his is the kind of situation where those kids and the mother should have been in an intensive program within weeks or a month after the child was removed."

The Court determined that it could not find the twins deprived under present circumstances: "It is clear that a petition to find the children deprived must be dismissed as such, since a finding of deprivation is a 'present finding' and cannot relate to the past or projected to the future. The children are in a good home, doing well, and

under no construction of the term deprived can this court find them deprived."

Because the lower court determined that it could not make a finding of deprivation, it chose to treat the case as a traditional custody battle between two parties equally entitled to custody. It placed the burden on appellant to prove that the best interests of the children would be served by changing the present custody arrangements: "Okay, on that basis the mother is seeking return even though there was no Petition or no court determination made that she was unfit at that time. I think we have to proceed on the basis that the children now have almost a basic right to remain where they are unless the mother can show that she has the ability and capacity that in their best interest those children should be returned to her." The court concluded that it must determine whether there were strong reasons for interrupting the present custody arrangements and whether the appellant was capable of providing adequate care: "There are two things in this case. One, I think just by virtue of the fact that Mrs. Harp has had these children so long and nowhere is there any indication that she is unfit. So, to my thought *under that circumstance alone, no matter how well qualified Ms. LaRue would be, how much her circumstances have changed, I would say at this time we would have to make an Order placing the children with Child Welfare in her home.* The other part is: *I haven't been convinced by anything I have heard here yet that Ms. LaRue is anywhere near being able to take these children back and giving them what would be equivalent or as good as what they are getting with Mrs. Harp,* even in a minimal way. I just don't believe that the circumstances there are stable enough that these children should be considered to be returned home for the indefinite future. . . ." (Emphasis supplied).

At the conclusion of the hearing, the court ordered that CWS retain custody and continue placement of the

twins in the foster home. It continued the case for six months with the intention of reviewing its order at that time.

## I

In order to articulate meaningful standards and procedures for juvenile courts to apply in child custody cases involving entrustment agreements, it is necessary to examine the interests at stake, the posture assumed by the Commonwealth in resolving those interests, and the procedures and standards established by the legislature for removing children from the custody of their parents.

The Juvenile Act [7] was adopted to effectuate the following legislative purposes:

"(1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this act;

"(2) Consistent with the protection of the public interest, to remove from children committing delinquent acts the consequences of criminal behavior, and to substitute therefor a program of supervision, care and rehabilitation;

"(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interests of public safety;

"(4) To provide means through which the provisions of this act are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced."

The Act provides comprehensive investigative and procedural safeguards to ensure that a child is not removed from the home unless it is determined that the child is ei-

---

7. Act of December 6, 1972, P.L. 1464, No. 333, § 1 *et seq.*; 11 P.S. § 50–101 et seq.

ther delinquent or deprived and that there are no other means available to the court to promote the purposes of the Act. It contemplates that a proceeding to remove a child from the home will be commenced either by a delinquency or deprivation petition. 11 P.S. § 50–314. After adequate notice and a hearing, the Act requires that the court ". . . . shall make and file its findings as to whether the child is a deprived child, or if the petition alleges that the child is delinquent, whether the acts ascribed to the child were committed by him. If the court finds that the child is not a deprived child or that the allegations of delinquency have not been established *it shall dismiss the petition and order the child discharged from any detention or other restriction theretofore ordered in the proceeding.*" 11 P.S. § 50–320(a) (Emphasis supplied).

If the court determines that the child is deprived, it is required by the Act to frame an order which is "best suited to the protection and physical, mental, and moral welfare of the child . . .". The court may:

"(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

"(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following: (i) any individual in or outside Pennsylvania who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child; (ii) an agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child or (iii) a public agency authorized by law to receive and provide care for the child.

"(3) Without making any of the foregoing orders transfer custody of the child to the juvenile court of another state . . . ." 11 P.S. § 50–321.

Thus, the Legislature has declared that the family unit is not to be invaded by agents of the Commonwealth unless it can be proven by clear and convincing evidence that a child is deprived.[8] Moreover, unless it is clearly necessary to separate child and parent, the family unit is to be preserved.[9] The Juvenile Act contemplates that the first intervention by the Commonwealth will be by petition brought in a juvenile court.

## II

The difficulty in the instant case arises from the fact that the legislative procedures were not followed; rather, the children were removed from the home under the authority of an entrustment agreement. The Juvenile Act makes no provision for entrustment agreements; it does not prescribe procedures and standards governing their revocation. In short, the Juvenile Act did not contemplate the factual situation in this case.

Our Supreme Court has recently held that entrustment agreements are valid. *Lee v. Child Care Service Delaware County Institution District*, 461 Pa. 641, 337 A.2d 586 (1975). The Court held that the Department of

8. The high standard embodied in the definition of deprivation is necessary to "impress[ ] the trier of fact and the parties with the importance of protecting the family from intrusion by the state". *Stapleton v. Dauphin County Child Care Service*, 228 Pa.Super. 371, 391, 324 A.2d 562, 573 (1974).

9. It has long been the law of this Commonwealth that the power of the state to separate a child from its parents is justifiable only in cases of clear necessity: "A court should not take the custody of children from their parents solely on the ground that the state or its agencies can find a better home for them. If 'the better home' were the only test, public welfare officials could take children from half of the parents in the state whose homes are considered to be the less desirable and place them in the homes of the other half of the population considered to have the more desirable homes. Upon extending the principle further, we would find that the family believed to have the best homes would have the choice of any of our children." *Commonwealth ex rel. Benson v. Wayne County Child Welfare Services*, 198 Pa.Super. 329, 332, 181 A.2d 850, 852 (1962).

Public Welfare regulations which authorized the county to utilize placement agreements were a valid exercise of the Department's statutory authority. Further, the Court rejected appellants' claims that the transfer of custody in this manner violated Pennsylvania decisional law or the due process clause of the federal constitution. In so doing, however, the Court emphasized the non-final nature of the agreement: "While it is certainly true that parents have a constitutionally protected interest in their children, see, e. g., *Weinberger v. Wiesenfeld,* 420 U.S. 636, 637, 95 S.Ct. 1225, 1226, 43 L.Ed.2d 514 (1975) (dictum) ; . . . appellants have failed to establish that the use of these 'placement agreements' in any way deprives them of due process. *This is not a case where parental rights are terminated without an opportunity for the parent[s] to prove their suitability to retain custody of their children.* . . . Instead, here the parents consent to the transfer of custody to the Service and on that basis the Service undertakes the care of their children. Parents are told in clear language that conditions for the return of their children are 'subject to the approval of [the Service].' Moreover, it is apparent that they give up no right to a judicial determination of their rights to custody of their children. The agreement clearly provides that in the event of any disagreement on the conditions for return of the child, the dispute will be 'reviewed' by the Juvenile Court." 461 Pa. at 650, 337 A.2d at 590 (Emphasis added).

Ideally, the entrustment agreement should be employed when a family finds itself in need of temporary assistance. See *Lee v. Child Care Service Delaware County Institution District,* supra, (Dissenting Opinion by NIX, J.). For example, a parent may become ill, lose his or her apartment, or be forced to leave the home for a period of time. If the parent has no relatives with whom the child may be left, it is perfectly reasonable to seek the aid of a social service agency. It is apparent, however,

that entrustment agreements are often secured by the child welfare agency in lieu of filing a deprivation petition. See, general, Levine, *Caveat Parens: A Demystification of the Child Protection System,* 35 Pitt.L.Rev. 1 (1973).

The Pennsylvania Department of Public Welfare Manual for Services to Children and Youth, Regs. 4302 and 4332 "stress that the 'parents right to maintain their relationship shall be safeguarded' and the supportive help is to be provided to the parents during the child's placement." Levine, *Caveat Parens,* supra at 21, n. 113. All too often, however an agency such as CWS, in its zeal to protect the child, loses sight of its corresponding duty to protect the interests of the parents, and to work with both child and parent in an effort to construct a foundation for the eventual return of the child. The net result of CWS's use of entrustment agreements as a substitute for a deprivation petition combined with the agency's failure to perform its duty to preserve the family is that the judicial function is supplanted and the stated legislative policy is thwarted. "An unpalatable reason for removal is that it is easier administratively to remove a child from an environment than to undertake the task of altering it. The result is that children are casually removed from their parents by agencies presumptively acting with the power of making a legal determination of deprivation. The portent of a double standard has been noted by a Pennsylvania Juvenile Court judge: 'The minimum standard of care expected of a family and the criteria for intervention are established by the agency empowered to provide the service. As a rule, the standard is less than necessary to sustain an adjudication of neglect.' It thus appears that many children removed by agencies would remain in their own homes if parents had the opportunity of being heard in a court of law." Levine, *Caveat Parens: A Demystification of the Child Protection System,* supra at 24–25.

While CWS's use of entrustment agreements may covertly defeat the rights of the parent to custody, the child who is placed in foster care may develop strong psychological bonds with its foster parents. Under the provision of the Juvenile Act, CWS resorts to court when it is necessary for the welfare of the child to intervene in the lives of the family and to establish a judicially sanctioned method of alleviating the conditions which impinge on the child's welfare. Because the child and the family have not yet been separated, the rights of the parent to custody and the interests of the child are sufficiently congruent that our legislature has declared that parent and child should not be separated unless justified by clear necessity. By contrast, when the Commonwealth has already separated the parent from its child under the authority of an entrustment agreement, the child's interests and the rights of the parent often grow increasingly divergent: "Nothing could be more cruel than the forceable separation of a child from either its real or foster parents by whom it has been lovingly cared for and to whom it is bound by strong ties of affection; to a child it is equally cruel whether the separation is brought about by 'kidnapping' or by legal process." *Commonwealth ex rel. Children's Aid Society v. Gard*, 362 Pa. 85, 97, 66 A.2d 300, 306 (1949). The juvenile court faces the difficult task of reconciling these potentially competing interests.

Clearly, the court cannot simply give the natural parent specific performance of the implicit provisions of the agreement allowing unilateral recission. The interests of children will not be governed by ordinary contract principles: "A child is not a chattel and therefore cannot be made the subject of a contract by a parent, with the same force and effect as a gift of conveyance, or grant of property, irrevocably or otherwise; the relationship of parent and child is a status and not a property right; the doctrine of the integrity of written instruments has

no materiality and since the welfare of the child is the determining factor, the court in the exercise of its equitable powers may ignore a bargain previously made by a parent in parting with a child . . . ." *Commonwealth ex rel. Berg v. The Catholic Bureau,* 167 Pa.Super. 514, 517, 76 A.2d 427, 429 (1950). See also, *Commonwealth ex rel. Children's Aid Society v. Gard,* supra; *Commonwealth ex rel. Bankert v. Children's Services,* 224 Pa.Super. 556, 307 A.2d 411 (1973). On the other hand, there is a danger that the court will focus on the child to such an extent that the very real interest of the natural parent is completely forgotten. The approach we should adopt must, therefore, ensure the protection of the parent's rights and the child's interests.

Because the Juvenile Act did not contemplate the use of entrustment agreements and because no case clearly controls the present situation, we should fashion procedures and standards which accommodate the potentially competing interests of parent and child while preserving the declared policy of the Commonwealth of preserving family unity, whenever possible.

## III

The proceeding to terminate an entrustment agreement may be commenced either by a petition by CWS to have the child declared deprived or by a habeas corpus petition brought by the natural parent.[10] There must be a hearing by the juvenile court which comports with due process standards contained within the Juvenile Act.[11]

10. The form of the petition or the party who filed it should not determine the standard. The instant case could have been commenced by a habeas corpus petition filed by appellant rather than a deprivation petition filed by CWS. See *Stapleton v. Dauphin County Child Care Service,* 228 Pa.Super. 371, 385, 324 A.2d 562 (1974).

11. Juvenile Act, supra; 11 P.S. §§ 50–312–50–320.

The court must first determine whether the evidence is clear and convincing that the child will be deprived if returned to the natural parent. We have recently held that this determination can be based on prognostic evidence. *In re DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976). Because the child-parent relationship has been disrupted by the entrustment agreement, the juvenile court will necessarily focus upon the ability and willingness of the natural parent to meet the child's physical, mental and moral needs. If the petitioner does establish by clear and convincing evidence that the child will be deprived, then the court must determine whether clear necessity dictates that the child be continued in foster care or whether a less drastic solution is available. At this stage of the court's inquiry, the focus will be on what combination of custody, visitation and counseling is best suited to the needs of the child. 11 P.S. § 50–321.

If the court determines that the evidence that the child will be deprived is not clear and convincing, the court must determine, in cases involving entrustment agreements, whether there are compelling reasons for continuing the child in foster care.[12] At this stage, the court

12. I recognize that this inquiry is not explicitly authorized by the Juvenile Act; and, to this extent, a proceeding after the revocation of an entrustment agreement deviates from the statutory scheme for deprivation proceedings. The facts of the instant case are analogous to those in *Stapleton v. Dauphin County Child Care Service*, supra. In *Stapleton*, Brent Leitzel, born on August 13, 1968, spent the first three months of his life in the custody of his natural parents. On November 22, 1968, the Dauphin County Child Care Service filed a petition alleging that Brent and his brother were deprived. Brent was placed with foster parents (not the Stapletons) until April 25, 1969, when he was returned to the Leitzels. The Service removed Brent a second time in August, 1969, and placed him in the custody of the Stapletons. The juvenile court adjudicated Brent a dependent child, and the Service was formally granted custody on January 30, 1970. Brent remained in custody of the Stapletons until October 10, 1973, when they returned him to the Service under the threat of a contempt citation. The litigation commenced when the Service notified the Stapletons that it intended to return Brent to his natural parents. Our Court held that because the case did not involve removal of the child from the home of the natural parent, a deprivation stan-

must attempt to reconcile the important rights of the parent to custody with the interests and welfare of the child. We emphasize that at this stage of the proceedings the court must not simply compare the homes of the foster and natural parents. Instead, the court should consider the following factors in reconciling the rights of the natural parent with the interests of the child.

The court must inquire into the facts and circumstances surrounding the agreement to determine if the parents' right to custody has been abused. Was the agreement signed under duress? Was the signing of the agreement clearly necessary in order to protect the child from living in continuing conditions amounting to deprivation? Or could more extensive efforts by CWS have preserved the integrity of the family?

The court must then examine the efforts of the parents to preserve a relationship with their child. It must determine whether those efforts were promoted or frustrated by the social service agency. It must determine whether foster care or CWS custody continued beyond the time that the disability or other reasons for signing the entrustment agreement had lapsed.

The court must also examine the effect of continued foster placement on a child. As we have already noted, a strong bond may grow between the child and his foster parents. If the child is uprooted again, severe psychological damage may result. The court must, therefore, attempt to determine how strong the bond between the

dard was inapplicable. We held that because there had already been a prior deprivation proceeding and the family had already been wrenched apart, the reason for the standard no longer existed and the court below should have awarded custody based upon an analysis of the child's best interests.

*Stapleton* did not address the situation in which the natural parent-child relationship was disrupted by means other than the judicial process. However, because the deprivation proceedings and standards contained within the Juvenile Act preclude any analysis of the interests of the child if there is no clear and convincing evidence of deprivation, I would extend the *Stapleton* rationale to the facts of the instant case.

child and the foster parents has grown. The duration and continuity of foster care and the age of the child will obviously bear on this aspect of the court's inquiry. If the child has been in foster care for a relatively short period of time, or has been shifted about from one foster home to another, or began foster care after it had attained an age which would enable it to accept and understand disruptive changes in its life, then it is less likely that the child will be adversely affected. On the other hand, if the child is relatively young or had continued in one foster home for a prolonged period of time, maintaining continuity will be much more important to the child's welfare.

Finally, the court must also consider the comparative ability of the two sets of parents to meet the physical, mental and emotional needs of the child. If the home of the natural parents is stable and the child's needs are likely to be met adequately, the court will be more ready to return the child to the natural parents. However, if the home of the natural parents is marginally adequate, and if the foster home is substantially better able to provide the necessities of a child's life, then the court will be more likely to continue foster care. In this respect, the court will necessarily take into account the needs of the child for stability and continuity. If one disposition is more likely to meet these needs, while the other would appear to be of a temporary nature, then the court should be more willing to place the child in a situation which will lead to stability.

Obviously, each case involving an entrustment agreement will ultimately be decided on the basis of its own particular facts and the foregoing list of factors is not meant to be exhaustive. For this reason, when a natural parent seeks to regain custody of a child, it is absolutely essential that the juvenile court conduct a complete evidentiary hearing. The rights of the natural parent and

future of a child cannot be determined on anything less than a thorough consideration of all relevant factors: "This court has repeatedly made plain that in a child custody case two requirements must be satisfied: the record must be complete; and the hearing judge must by his opinion give us the benefit of a thorough analysis of that record." *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976).

I empathize with the plight of the parties and with the difficult choices facing our juvenile courts. The lower court in the instant case was obviously moved by sincere concern for the welfare of the children, the frustrations of appellant, and the potentially thankless position of the foster parents. Nevertheless, I would vacate the order of the lower court and remand for further proceedings because I do not believe the lower court gave adequate weight to appellant's right to custody. The lower court did not inquire into the facts and circumstances surrounding the signing of the entrustment agreement. It deprived appellant of an opportunity to confront and cross-examine witnesses who could shed light on this subject. It should not have placed the burden on appellant to show that her home was better than the foster parents. The lower court did not have the benefit of this Court's reasoning in *In re: Dale Henry DeSavage*, supra, which authorized an examination of the adequacy of the appellant's home under a deprivation standard based on prognostic evidence. I am confident that the lower court will remedy these problems on remand.

I would vacate the order of the lower court and remand for proceedings consistent with this opinion.

PRICE, Judge (dissenting):

As in the case of *In re: DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1975), I would affirm the order of the lower court. As is noted in my dissent therein, we should not engage in word-play so that the judgment of an appellate court may be substituted for that of the low-

er court. I recognize and admire the compassion and good-will of my colleagues in their efforts, nevertheless, I continue to believe that such efforts are leading to increasingly confusing and contradictory results in our courts and are absolutely unnecessary to the field of law to which they are addressed.

I would affirm on the opinion of the lower court (Tamilia, J.) with a single caveat. The lower court opinion refers to the order involved as an "interlocutory order", and if that characterization is meant to imply that it may not be appealed, I could not accept that concept. The order continued the case for six months and reaffirmed the entrustment agreement. Since it continued the custody of the foster parents for that same period, it is a final order and appealable.

I would affirm the order of the lower court.

VAN der VOORT, J., joins in this dissenting opinion.