J-S68013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LACKAWANNA COUNTY CHILDREN AND YOUTH | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 928 MDA 2017 |

Appeal from the Order Entered May 10, 2017
In the Court of Common Pleas of Lackawanna County Civil Division at
No(s):  CP-35-DP-0000154-2016

BEFORE:   LAZARUS, J., DUBOW, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                **FILED DECEMBER 01, 2017**

The Lackawanna County Office of Youth and Family Services ("Agency") appeals from the order, entered in the Court of Common Pleas of Lackawanna County, denying a finding of child abuse and ordering bone density and genetic testing of the minor, M.M.-A. ("Child").  Upon careful review, we affirm.

On November 12, 2016, Child, then three months old, was taken by her parents to Moses Taylor Hospital for treatment of a possible cold.  During treatment, hospital staff discovered that Child had multiple rib fractures,[1] for which her parents, V.A. and A.M. (collectively, "Parents") had no explanation. Child and her sister – who did not present with any injuries – were taken into protective custody based upon Child's unexplained injuries.

---

[1] It was ultimately determined that Child had approximately 38 rib fractures.

---

*   Retired Senior Judge assigned to the Superior Court.

On November 15, 2016, the Agency filed a petition seeking a finding of dependency of Child and also seeking a finding of child abuse against Parents pursuant to the Child Protective Services Law, 23 Pa.C.S.A. §§ 6301-6386 (the "Act"). After a multi-day adjudication hearing, on May 10, 2017, the trial court issued findings of fact and conclusions of law, as well as an order adjudicating Child to be dependent pursuant to 42 Pa.C.S.A. § 6302, based on evidence that Child suffered 38 rib fractures while in Parents' care and control, as well as the fact that Child had been diagnosed with failure to thrive. The court declined, however, to issue a finding that Child was a victim of abuse. The court also ordered further health evaluations in the form of testing for genetic disorders and/or bone deficiency disorders.

On June 7, 2017, the Agency filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2). The Agency raises the following claims for our review:

1. Whether the [t]rial [j]udge erred . . . and/or abused her discretion by not determining credibility of witnesses, including expert witnesses and resolving conflicts in the testimony?

2. Whether the trial judge erred and/or abused her discretion by not making a finding of child abuse against the parents.

3. Whether the trial judge erred and/or abused her discretion in reviewing the medical testimony by admitting novel medical testimony from Doctors Holick, Hyman and Gootnick in violation of the *Frye*[2] standard, and by accepting Dr.

---

[2] *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923) (holding novel scientific evidence admissible if methodology underlying evidence has general acceptance in relevant scientific community).

Gootnick as a pediatric radiology expert despite a lack of qualifications or training in said specialty[?]

4. Whether the trial judge erred and/or abused her discretion by finding that pediatrician Dr. Burke had diagnosed the child as fail[ing] to thrive (finding of fact #167) which is not supported by the evidence; and further erred and disregarded test results showing no evidence that the child had OI (osteogenesis imperfecta) and had normal Vitamin D levels, by ordering genetic testing, bone density disorders testing and [that the Agency] follow any and all recommendations when the experts agree [Ehlers-Danlos Syndrome] has no test to identify it, and no metabolic disease or genetic disorders of the child have been diagnosed by treating physicians[?]

Brief of Appellant, at 8.

The Agency first asserts that the trial court erred and/or abused its discretion by failing to make determinations as to the credibility of witnesses, including expert witnesses, and failing to resolve conflicts in the testimony. This claim is meritless.

In this case, four different experts testified regarding the cause of Child's fractures. One of those experts, Kent Hymel, M.D., testifying on behalf of the Agency as an expert in child abuse pediatrics and pediatrics, concluded that the injuries were the result of child abuse. The other three experts concluded that Child's injuries had clinical explanations and were not caused by abuse. Susan Gootnick, M.D., an expert in pediatric radiology, testified that she was certain that Child's fractures were caused by rickets and that there was no evidence of non-accidental trauma. Charles Hyman, M.D., an expert in child abuse, testified that Child suffered from bone fragility and that rickets was a possible contributing factor. Doctor Hyman further testified that there were "absolutely no objective criteria that there was abuse." N.T. Hearing, 7/5/17,

at 68. Finally, Michael Holick, M.D., Ph.D., testified as an expert in endocrinology, metabolism and nutrition, calcium, collagen disorders, metabolic bone disease, and Vitamin D deficiencies. Doctor Holick diagnosed both of Child's parents with EDS, hypermobility type 3. As a result, Dr. Holick determined that Child had a 75% chance of also suffering from that genetic disorder, which would place her at higher risk of bone fracture.

In its opinion, the trial court stated that it "considered the direct and circumstantial evidence and expert medical opinions" presented by the Agency. However, the court ultimately found more compelling the testimony of the three other experts who each concluded, to a reasonable degree of medical certainty, that Child's injuries were not the result of non-accidental trauma. In making this determination, the court factored in other evidence, including that Parents regularly took Child for medical visits to both her pediatrician and specialists and that Child's physician, a mandatory reporter, never made any reports of child abuse. *See* Trial Court Opinion, 5/7/17, at 5-6. In sum, it is apparent that the trial court weighed the evidence before it, resolved any conflicts in testimony to the best of its ability based on the totality of the evidence presented, and concluded that the Agency failed to establish by clear and convincing evidence that Parents had abused Child. We can discern no abuse of discretion.

The Agency next claims that the trial court erred and/or abused its discretion by failing to make a finding of child abuse against Parents. The Agency asserts that it presented clear and convincing evidence that Parents

were reckless with respect to Child's torn frenulum as well as her fractured ribs and, as a result, the court should have made a finding of abuse under section 6303(b.1) of the Act. This claim is meritless.

We begin by noting our standard and scope of review in dependency cases:

> The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*Matter of C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997), quoting *In re R.R.*, 686 A.2d 1316, 1317 (Pa. Super. 1996) (citations omitted).

Child abuse is defined under section 6303 of the Act, in relevant part, as follows:

> (b.1) Child abuse.--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
>> (1) Causing bodily injury to a child through any recent act or failure to act.
>>
>> . . .
>>
>> (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa.C.S.A. § 6303(b.1). A finding of abuse must be supported by clear and convincing evidence. *In Interest of J.R.W.*, 631 A.2d 1019, 1024 (Pa. Super. 1993).

Here, the Agency asserts that it met its burden of establishing Parents' recklessness in causing damage to Child's frenulum and her rib fractures. With respect to the torn frenulum, the Agency cites the testimony of Dr. Hymel that Child could not have caused the injury to herself and the injury could have been caused by a bottle being forced in Child's mouth. The Agency asserts that Dr. Hyman's testimony, that frenulum injuries in children are very common, was "not specific enough to be convincing." Brief of Appellant, at 14. As to Child's rib fractures, the Agency cites Parents' claim that they did not know how the injuries occurred and the testimony of Dr. Hymel, who excluded metabolic bone disease as a potential cause and, instead, "gave a solid opinion with a reasonable degree of medical certainty of physical abuse." *Id.* at 16. Based on this evidence, the Agency claims that it established that Parents acted recklessly and that the court erred in failing to make a finding of child abuse as defined in section 6303(b.1) of the Act.

In presenting this claim, the Agency is essentially asking this Court to reweigh the evidence in its favor. That, however, is not our role. Rather, we must defer to the trial court, who sees and hears the witnesses, can determine their credibility and, ultimately, renders a decision informed by the court's own observations and its longitudinal understanding of the case. So long as the court's conclusions are supported by the record, we are in no position to disturb its decision. *Matter of C.R.S.*, *supra*.

Although Dr. Hymel opined that Child's injuries were the result of abuse, the trial court heard from multiple other witnesses, both fact and expert, who

concluded otherwise. Child's own pediatrician, Christine Burke, M.D., testified that she never suspected that Child's torn frenulum was non-accidental. Rather, based on the large size of the nipple on Child's bottle, Dr. Burke concluded that the tear likely came from pressure exerted by the nipple. Doctor Hyman also testified that torn frenula are "very common" in children and can be caused by bottles or pacifiers. N.T. Hearing, 5/3/17, at 52. He concluded that Child's torn frenulum was "absolutely" not caused by abuse. *Id.* at 56. Similarly, with regard to the rib fractures, three experts testified as to their belief that the fractures were caused not by non-accidental trauma, but rather by bone fragility.

It was within the province of the trial court to evaluate and weigh the conflicting testimony and arrive at a finding based on its determination as to the credibility of the witnesses. *See Commonwealth v. Ratushny*, 17 A.3d 1269, 1272 (Pa. Super. 2011) ("The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record."). Accordingly, we decline the Agency's invitation to reweigh the evidence. The trial court's findings are supported by the record and will not be disturbed.

Next, the Agency claims that the trial court erred in admitting novel medical testimony from Drs. Holick, Hyman and Gootnick in violation of *Frye*. The Agency also alleges that the court erred in admitting Dr. Gootnick as an expert in pediatric radiology despite a lack of qualifications or training in that specialty. The first claim is waived and the second is meritless.

In determining whether novel scientific evidence is admissible in criminal trials, Pennsylvania courts apply the test set forth in *Frye* []. *See Commonwealth v. Topa*, [] 369 A.2d 1277 ([Pa.] 1977) (adopting the *Frye* test in Pennsylvania). Under *Frye*, novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community. *See Grady v. Frito–Lay, Inc.*, [] 839 A.2d 1038, 1044–1045 ([Pa.] 2003). While the United States Supreme Court has since found that the *Frye* test has been superseded by the more permissive Federal Rules of Evidence, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 [] (1993), Pennsylvania courts are not bound by the Federal Rules of Evidence, and continue to apply the *Frye* standard, *see Grady*, [] 839 A.2d at 1044.

*Commonwealth v. Einhorn*, 911 A.2d 960, 974–75 (Pa. Super. 2006).

"Whether a witness is qualified to render opinions and whether his testimony passes the *Frye* test are two distinct inquiries that must be raised and developed separately by the parties, and ruled upon separately by the trial courts." *Grady v. Frito-Lay, Inc.*, 839 A.2d at 1045–46.

While the Agency now claims that the testimony of Drs. Holick, Hyman and Gootnick was inadmissible pursuant to *Frye*, it never filed a motion seeking to preclude the doctors' testimony on the basis of *Frye*, nor did the Agency raise the issue at all at the time of hearing in this case. Generally, "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P., Rule 302(a). Because the Agency failed to preserve this claim in the trial court, the issue is waived.

The Agency also claims that the trial court erred in admitting Dr. Gootnick as an expert in pediatric radiology. This claim is premised solely on

the fact that Dr. Gootnick is not a Board Certified pediatric radiologist. The Agency is entitled to no relief.

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. We may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*McClain ex rel. Thomas v. Welker*, 761 A.2d 155, 156 (Pa. Super. 2000) (citation, ellipses and brackets omitted).

In *Miller v. Brass Rail Tavern*, 664 A.2d 525 (Pa. 1995), our Supreme Court held that a witness without a medical degree, who acted in the dual role of mortician and county coroner, could give expert testimony as to time of death. In doing so, the Court noted that

> [i]t is well established in this Commonwealth that the standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine.

*Id.* at 528.

Here, Dr. Gootnick testified that she holds a medical degree and has been certified by the American Board of Radiology since 1977. She testified that she participated in a three-month rotation in pediatric imaging during her residency and reads pediatric radiological images on a daily basis as part of her practice. She testified that, at the time of her residency, there was no

fellowship in pediatric radiology and that she has "more experience than somebody with a current pediatric [radiology] fellowship." N.T. Hearing, 5/4/17, at 8.

Based on the foregoing, it is readily apparent that Dr. Goodnick "possesses more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience" in pediatric radiology. **McClain**, 761 A.2d at 157, quoting **Miller**, 664 A.2d at 528. The fact that she does not hold a board certification in the specialty is of no moment. Accordingly, the trial court did not abuse its discretion in admitting Dr. Gootnick as an expert in pediatric radiology.

Finally, the Agency claims that the trial court erred in making a finding of fact that Dr. Burke, Child's pediatrician, had diagnosed Child with failure to thrive. The Agency further asserts that the court erred in ordering further testing to determine if Child suffers from any genetic bone density disorders. These claims are meritless.

We begin by noting that it is unclear as to how the Agency is aggrieved by either of these alleged errors. Indeed, it would appear that the Agency would look with favor upon the court's finding that Child was diagnosed with failure to thrive, as it was "[b]ased in part on Dr. Burke's testimony that Minor Child was diagnosed as failing to thrive . . . [that] this [c]ourt found that Minor Child was without proper parental care or control." Trial Court Opinion, 7/7/17, at 13. In any event, the Agency is incorrect that there is no support for this finding. Specifically, Dr. Burke testified as follows:

Q: In your treatment of [Child], was she ever treated as a baby that was one labelled as failure [sic] to thrive?

A: Yes, but it was difficult to distinguish because she was having so many mouth issues. I wasn't sure if that was contributing to her slow weight gain.

N.T. Hearing, 3/23/17, at 16.

Similarly, the Agency's claim that the court erred in ordering genetic testing is meritless. "In a dependency case, a hearing court is given broad discretion in meeting the goal of entering a disposition 'best suited to the protection and physical, mental, and moral welfare of the child.'" *In re S.M.*, 614 A.2d 312, 315 (Pa. Super. 1992), quoting *In re Lowry*, 484 A.2d 383 (Pa. 1984). In her Rule 1925(a) opinion, the Honorable Julia Munley cogently sets forth her rationale for ordering the tests of which the Agency complains. *See* Trial Court Opinion, 7/7/17, at 13-15. Based on Judge Munley's findings, we can discern no abuse of discretion on her part in ordering that Child undergo further testing to determine whether she suffers from any genetic disorders that may have contributed to or caused the injuries that form the basis for the adjudication of dependency. The parties are instructed to attach Judge Munley's opinion in the event of further proceedings in this matter.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/1/2017

: IN THE COURT OF COMMON PLEAS
: OF LACKAWANNA COUNTY
:
IN RE: M. M.-A. : JUVENILE DIVISION
:
: CP-35- DP – 154 – 2016

MUNLEY, JULIA, J.                                                July 7, 2017

RULE 1925(a) OPINION IN SUPPORT OF ORDER DATED MAY 10, 2017

The Lackawanna County Office of Youth and Family Services ("OYFS") filed a Petition seeking a finding of dependency of Minor Child M. M.-A. (D.O.B. 08/  /2016) based on allegations of physical abuse by Mother V      A      ("Mother") and Father A      M      ("Father") and failure by Minor Child's parents to provide proper parental care or control. OYFS's Petition also sought a finding of child abuse against Mother and Father pursuant to the Child Protective Services Law, 23 Pa.C.S.A. § 6301 *et seq.* ("CPSL")

A sheltercare hearing was held on November 14, 2016. The adjudication hearing was held on March 23, 24; April 11; and May 3, 4, 2017.

Having weighed and considered the relevant evidence and testimony in this matter, this Court entered an Order dated May 10, 2017 and also issued specific Findings of Fact and Conclusions of Law. See Pa. Rule J. C. P. 1409 *cmt.* (citing In re LaRue, 244 Pa. Super. 218, 366 A.2d 1271 (1976); In re Frank W.D., Jr., 315 Pa. Super. 510, 462 A.2d 708 (1983); In re Clouse, 244 Pa. Super. 396, 368 A.2d 780 (1976)). On May 10, 2017, this Court granted OYFS's petition in part, finding that Minor Child is a dependent child as defined by 42 Pa. C.S. § 6302 based on evidence that Minor Child sustained as many as thirty-eight rib fractures while in Mother and Father's care and control. Prior to the discovery of the rib fractures, Minor Child was also diagnosed as failing to thrive and Mother and Father missed at least two appointments with Minor Child's pediatrician after a failure to thrive diagnosis was made. This Court denied

A-1

OYFS's petition in regard to a finding of child abuse under the CPSL for the reasons set forth in the Findings of Fact and Conclusions of Law and discussed below.

On June 7, 2017, OYFS filed a Notice of Appeal and a Concise Statement of Errors. Although the reasons for this Court's May 10, 2017 Order appear of record in the aforementioned Findings of Fact and Conclusions of Law, this Court, having the benefit of the transcripts from the adjudication hearing, provides this brief Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a). The matters raised by OYFS on appeal are listed below and addressed in turn.

*1) The trial judge erred by and/or abused her discretion by not determining credibility of witnesses, including expert witnesses and resolving conflicts in the testimony.*

As trier of fact, this Court is the sole judge of the credibility of witnesses. See In re Adoption of J.J., 511 Pa. 590, 594, 515 A.2d 883, 886 (1986). Conflicts in testimony are to be resolved by this Court. Id.

In considering this matter, this Court heard witness testimony from several fact witnesses and medical expert witnesses. As detailed in the Findings of Fact and Conclusions of Law, this Court fully considered all of the relevant evidence and testimony and closely scrutinized the medical experts' testimony and conclusions in light of the other facts in this case.

An evaluation of the credibility of witnesses can be found in the Court's Findings of Fact and Conclusions of Law. This Court found all witnesses to be at least partially credible and noted where witness testimony was less reliable or less weighty to the Court in light of the other facts that emerged over the course of the hearing. See e.g. ¶¶ 73, 88, 91-102 (discussing the facts that weakened the credibility of OYFS expert Dr. Kent Hymel and eroded his conclusion that child abuse occurred).

Resolution of the conflicts in testimony can also be found in the Court's Findings of Fact and Conclusions of Law. For example, Dr. Hymel relied on the high number of fractures to support his conclusion that there was child abuse. 03/24/2017 Trans. at 91-92. Defense expert Dr. Charles Hyman also relied on the high number of fractures to support his conclusion that Minor Child had a medical disorder causing bone fragility. 05/03/2017 Trans. at 56-59. Where the medical experts disagreed regarding a finding of child abuse, this Court resolved conflicting testimony when it found that the testimony of Dr. Hymel was insufficient to meet OYFS's burden of proving child abuse against Mother and Father by clear and convincing evidence when contrasted with the testimony of defense experts Dr. Michael Holick, Dr. Hyman, and Dr. Susan Gootnick.

### 2) *The trial judge erred and/or abused her discretion by not making a finding of child abuse against the parents.*

This Court had the opportunity to fully evaluate the evidence, including extensive expert medical testimony, and to weigh the credibility of all witnesses. Based on the totality of the circumstances, as summarized in the Findings of Fact and Conclusions of Law, OYFS failed to show by clear and convincing evidence that Minor Child was the victim of child abuse as defined by 23 Pa. C.S. § 6303(b.1), (c).

The term "child abuse" means intentionally, knowingly or recklessly doing any of the following:

> (1) Causing bodily injury to a child through any recent act or failure to act [...]

> (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act [...]

23 Pa. C.S.A. § 6303 (b.1).

"Conduct that causes injury or harm to a child or creates a risk of injury or harm to a child shall not be considered child abuse if there is no evidence that the person acted intentionally, knowingly or recklessly when causing the injury or harm to the child or creating a risk of injury or harm to the child." 23 Pa. C.S.A. § 6303(c).

OYFS must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations. See In re L.Z., 631 Pa. 343, 361, 111 A.3d 1164, 1174 (2015). Clear and convincing evidence is defined "as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re K.M., 53 A.3d 781, 786 (Pa. Super.2012) (citations and internal quotations omitted).

The evidence and testimony in this case is not clear and convincing that Mother or Father acted intentionally, knowingly, or recklessly to cause Minor Child's injuries or to create a risk of injury or harm to the child. See 18 Pa.C.S.A. § 302(b)(1)-(3).

In reaching the above conclusion, this Court considered the direct and circumstantial evidence and expert medical opinions presented by OYFS in support of their petition. Dr. Hymel opined that the rib fractures might have resulted from sudden and dangerous compressions to the Minor Child's chest as a mechanism of injury. 03/24/2017 Trans. at 82, 143. However, there was no other evidence that Mother, Father, or any other person actually made sudden compressions to Minor Child's chest. Rather, Dr. Holick, Dr. Hyman, and Dr. Gootnick each provided non-abusive explanations for Minor Child's rib fractures within a reasonable degree of medical certainty.

Dr. Holick opined that Minor Child's rib fractures were fragility fractures that could occur at birth or with normal handling of an infant, such as picking up the child or swaddling.

04/10/2017 Trans. at 74-75. According to Dr. Hyman, Minor Child had a constellation of factors that caused rib fractures, torn frenulum, and failure to thrive that were not abuse. 05/03/2017 Trans. at 55-61. Dr. Hyman opined that Minor Child had some type of bone fragility and that the high number of healing or occult rib fractures supported his opinion. Id. at 56-59. Dr. Hyman also indicated that non-abusive reasons for Minor Child's injuries were either ignored or not objectively considered by Minor Child's treating physicians. Id. at 56, 68, 105-106. Dr. Gootnick testified that she observed radiographic evidence of healing rickets on Minor Child's X-Ray films, called a rachitic rosary. 05/04/2017 Trans. at 18. She testified that the rachitic rosary is a pathognomonic sign, a characteristic unique to rickets. Id. at 22. Dr. Gootnick opined within a reasonable degree of medical certainty that Minor Child had abnormal bones based on her X-Ray findings and that there was no radiological evidence of non-accidental trauma. Id. at 18-21, 27. Dr. Gootnick also suggested that some of the abnormalities observed on X-Ray as healing fractures were actually signs of rickets. Id. at 19-20.

Furthermore, two of the defense medical experts in this matter testified that considerable bone density loss had to occur before it would be observable on an X-Ray. 04/11/2017 Trans. at 57 (Holick: 30-50% loss of bone density); 05/03/2017 Trans. at 70-71 (Hyman: 20%-40% loss of bone density). Dr. Hymel, on behalf of OYFS, could not completely rule out that Minor Child had reduced bone density. See 03/24/2017 Trans. at 135-137, 175-177.

There was other evidence that this Court weighed before finding that Mother and Father did not intentionally, knowingly, or recklessly cause Minor Child's injuries or create a risk of injury or harm to Minor Child. Minor Child was taken by Mother and Father to medical providers at least twelve times in three months, including her pediatrician and to several specialists outside the Scranton area. 03/23/2017 Trans. at 44-45; 05/03/2017 Trans. at 40.

Minor Child was taken to Moses Taylor Hospital by Mother and Father where the rib fractures were discovered on November 12, 2016. Id. at 38-39, 53-54. Prior to November 12, 2016, Minor Child's pediatrician and treating specialists did not make any reports of child abuse for torn frenulum or failure to thrive even though these physicians were mandated reporters. Id. at 110, 119, 245. Additionally, OYFS's caseworker Lisa Herie testified that Minor Child was not in any discomfort and was not crying when Herie responded to the initial referral at Moses Taylor Hospital. Id. at 54-56. At the time Herie responded to the hospital, Minor Child was restrained in a car seat. Id. Minor Child's one-year-old sister I.M.-A. did not present with any signs of physical injury when Minor Child M.M.-A.'s rib fractures were discovered. Id. at 63.

After consideration of all the evidence and testimony presented in this case, it was not clear and convincing to this Court that Mother and Father committed child abuse.

3) *The trial judge erred and/or abused her discretion in reviewing the medical evidence by admitting novel medical testimony from Doctors Holick, Hyman, and Gootnick in violation of the Frye standard and by accepting Dr. Gootnick as a pediatric radiology expert despite a lack of training in said specialty.*

In this matter, the expert testimony of Dr. Holick, Dr. Hyman, and Dr. Gootnick was properly admitted pursuant to Pennsylvania Rules of Evidence 702-705.

Rule 702(c) provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's methodology is generally accepted in the relevant field." The admission of expert scientific testimony is an evidentiary matter for the trial court's discretion. Grady v. Frito-Lay, Inc., 576 Pa. 546, 559, 839 A.2d 1038, 1046 (2003). Rule 702 provides a wide latitude for the admission of expert testimony. See Long v. Mejia, 896 A.2d 596, 600-01 (Pa. Super. 2006).

In this appeal, OYFS now challenges the admission of the medical testimony of Dr. Holick, Dr. Hyman, and Dr. Gootnick pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir.

1923). On a preliminary note, OYFS did not move to exclude expert testimony prior to the adjudication hearing. During the hearing, OYFS did not raise the issue of the admissibility of testimony of any of the defense medical expert witnesses on the grounds of an issue with the experts' methods. Although there were no objections by OYFS in regard to the defense experts' methods during the hearing, this Court considered the expert opinions and admitted Mother and Father's expert witness testimony pursuant to the above-cited Pennsylvania Rules of Evidence.

Under Frye, the proponent of novel scientific evidence bears the burden of establishing that the methodology used by the expert has gained general acceptance in the relevant field, but not "that the scientific community has also generally accepted the expert's conclusion." Grady, 576 Pa. at 558, 839 A.2d at 1045. As an exclusionary rule of evidence, Frye "must be construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth." Trach v. Fellin, 817 A.2d 1102, 1104 (Pa. Super. 2003) (en banc), app. denied, 577 Pa. 725, 847 A.2d 1288 (2004).

"[A]n expert witness need not cite to medical literature or medical treatises to support his opinion." Catlin v. Hamburg, 56 A.3d 914, 921 (Pa. Super. 2012)(citing Joyce v. Blvd. Phys. Therapy & Rehab. Ctr., P.C., 694 A.2d 648, 656 (Pa.Super. 1997); Smith v. Grab, 705 A.2d 894, 900 (Pa. Super. 1997)). However, at a minimum, "the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion" Snizavich v. Rohm & Haas Co., 83 A.3d 191, 197 (Pa. Super. 2013). Expert testimony as to a causal relationship may be admissible, even if based solely on the expert's review of medical records and his experience and expertise in the applicable medical field, when the expert can point to some scientific authority that supports the causal connection. Id. Medical

witnesses may rely upon their individual professional experiences in their fields of expertise in formulating opinions regarding medical matters. Page v. Moses Taylor Hospital, No. 11-CV-1402, 2016 WL 2606520 *5 (Lacka. C.C.P.)(Nealon, J.)(citations omitted).

a. Dr. Holick

Mother and Father presented the testimony of Michael F. Holick, Ph.D., M.D., a professor at Boston University Medical Center, prior chief of endocrinology, and director of the Ehlers-Danlos Syndrome ("EDS") Clinical Research Program. 04/11/2017 Trans. at 23-25; Exh. 4. Dr. Holick testified that he is the director of the bone health care clinic at Boston University Medical Center. Id. at 24. Dr. Holick's areas of research include Vitamin D, metabolic bone disease, and collagen disorders and he has been published over 500 times in these fields. Id. Dr. Holick was thus admitted as an expert in endocrinology; nutrition, metabolism and collagen disorders; metabolic bone disease; and vitamin D deficiency. Id. at 31, 41.

Within a reasonable degree of medical certainty Dr. Holick diagnosed Mother and Father with EDS hypermobility type 3, based on a review of factors after his physical examination of both parents. Id. at 44-49. The factors Dr. Holick used to diagnose Mother and Father with EDS hypermobility type 3 were based on Dr. Holick's clinical findings and Mother and Father's self-reporting. Id. Dr. Holick used a method of diagnosis called a Beighton score to diagnose Mother and Father with EDS hypermobility type 3. Id. at 45-48. At no time did OYFS raise any objections to the use of Beighton scoring to diagnose Mother and Father with EDS.

Dr. Holick also opined within a reasonable degree of medical certainty that because Mother and Father have EDS, it was very likely that Minor Child has EDS, a 75% chance. Id. at 51-54. Dr. Holick reached that conclusion using simple mathematics because EDS is an autosomal dominant genetic disorder. Id. Dr. Holick also testified that there is no genetic test to

determine whether a person has EDS hypermobility type 3. Id. at 69. Given Dr. Holick's testimony and no challenge from OYFS as to Dr. Holick's methods, this Court admitted and considered Dr. Holick's methods as generally accepted in the medical and scientific community.

Even if an objection to Dr. Holick's methodology had been properly raised and considered at the hearing, this Court ultimately did not determine that Minor Child suffered from EDS or that EDS was the specific cause of her multiple, bilateral rib fractures. Rather, this Court found credible from Dr. Holick's testimony that non-abusive explanations for Minor Child's rib fractures existed and could not be ruled out in this matter by the treating physician, Dr. Hymel.

### b. Dr. Hyman

Mother and Father also presented the testimony of Charles Hyman, M.D, who was qualified by this Court as an expert in the field of child abuse. At the hearing, OYFS and the Guardian ad Litem objected regarding Dr. Hyman's *qualifications* only – specifically, his lack of board certification in child abuse pediatrics and that he had been precluded from testifying about bones in past cases. 05/03/17 Trans. at 27-28. Dr. Hyman was not board-certified in child abuse because, as he stated, he would have to provide answers on the board-certification test that he did not believe were accurate. Id. at 26. OYFS and the Guardian ad Litem's objections were overruled and Dr. Hyman was admitted as a child abuse expert based on his education, experience, research, and extensive review of the medical records. Id.

There was no objection at the hearing regarding Dr. Hyman's methodologies. "Whether a witness is qualified to render opinions and whether his testimony passes the Frye test are two distinct inquiries that must be raised and developed separately by the parties." Grady, 576 Pa. at 558–59, 839 A.2d at 1045–46 (2003) (citing Commw. v. Arroyo, 555 Pa. 125, 723 A.2d 162, 170 (1999)).

As to qualifications, Dr. Hyman testified that he is a board-certified pediatrician and has been involved in pediatric medicine for 50 years. 05/03/17 Trans. at 8-9. Early in his medical career, Dr. Hyman completed a two-year fellowship in newborn intensive care at Pittsburgh Children's Hospital. Id. at 5. After moving to Southern California, Dr. Hyman developed a child abuse team at Loma Linda Children's Hospital in 1976 and chaired that department for five years in addition to maintaining a private practice and being a member of the hospital faculty. Id. Thereafter, Dr. Hymel was involved in the child protection team at St. Bernadines Hospital, while still affiliated with Loma Linda Children's Hospital. Id. at 5, 12-13, 18. Dr. Hymel remained in private practice until about 2000. Id. at 6.

Dr. Hyman has concentrated the last thirty years of his professional work on research and studies that are contrary to the predominant views regarding child abuse in the professional medical community, including the views held by the American Academy of Pediatrics and the Society of Pediatric Radiology. Id. at 19, 21-22. Dr. Hymel advised he is a member of a loose-knit group of medical professionals "interested in sorting out the debate on infant injury." Id. at 7. Dr. Hyman explained that there is another segment of the medical community that disputes the conclusions of what Dr. Hyman called "the child abuse community." Id. at 22-23. Dr. Hyman testified that there are peer-reviewed studies and literature in the areas of trauma, genetics, endocrine, biomechanics, and bone science that challenges or refutes the positions held by the American Academy of Pediatrics and the Society of Pediatric Radiologists regarding child abuse. Id. at 21-22. As part of his work, Dr. Hyman has testified in approximately fifty-six trials since 2002 in the field of general pediatrics and child abuse. Id. 12-13, 18. Dr. Hyman was thus qualified to render an expert medical opinion regarding child abuse in this matter.

Within a reasonable degree of medical certainty, Dr. Hyman opined that the injuries to Minor Child were not the result of child abuse. 05/03/17 Trans. at 55-61. In support of his opinion that there were no objective signs of abuse and that there were non-abusive reasons for Minor Child's injuries, Dr. Hyman cited his review of the medical records and his experience along with citation to other research and studies. Id. This approach is not novel.

Dr. Hyman's conclusions were challenged by OYFS and the Guardian ad Litem during the adjudication hearing. Under cross-examination, Dr. Hyman agreed that Minor Child met seven of nine factors listed by the American Academy of Pediatrics for suspicion of child abuse, but testified that he believes there is no "gold standard" for a child abuse diagnosis. Id. at 79-84, 116. A party need not prove that an expert's conclusions are generally accepted, only that an expert's methods are generally accepted. See Grady, supra. Moreover, Frye is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science. Id., 576 Pa. at 557, 839 A.3d at 1045. As indicated above, there was nothing novel about Dr. Hyman's methodology and Dr. Hyman's methods were not used in a novel way. Thus, Dr. Hyman's opinions were properly admitted.

c. Dr. Gootnick

OYFS objects that Dr. Gootnick was admitted as a pediatric radiologist. The qualifying test for a witness to testify as an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. Miller v. Brass Rail Tavern, Inc., 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995). If she does, she may testify and the weight to be given to such testimony is for the trier of fact to determine. Id.

As to Dr. Gootnick's qualifications, she graduated from the University of California, San Francisco Medical School and completed an internship and residency in radiology. 05/04/2017

Trans. at 4. There were no pediatric radiology fellowships when Dr. Gootnick was a resident, according to Dr. Gootnick, but she did undergo a three-month rotation during her residency where she specifically reviewed pediatric imaging. Id. at 5, 7-8. Dr. Gootnick has been board certified by the American Board of Radiology since 1977, but not board certified in the field of pediatric radiology. Id. at 4-5, 10. Although not board certified in pediatric radiology, Dr. Gootnick testified that she has read and interpreted radiologic images of pediatrics patients every workday over the course of her 42 year career. Id. at 5, 8-9. Of the pediatric images that she reviews, Dr. Gootnick testified that she mostly reads the X-Rays of newborns. Id. at 14. Based on Dr. Gootnick's education, training, and extensive experience in reviewing radiological imaging of infants and children, the Court permitted her to testify as an expert in the field of pediatric radiology. Id. at 16. Dr. Gootnick was clearly qualified to do so.

OYFS also challenges Dr. Gootnick pursuant to Frye. There was nothing novel about Dr. Gootnick's methods, which consisted of reviewing X-Rays and offering an opinion based on her education, training, and experience. Given her qualifications and her use of generally accepted methods in reaching her expert medical opinions, Dr. Gootnick's testimony was properly admitted pursuant to Rule 702.

4) *The trial judge erred and/or abused her discretion by finding that the pediatrician Dr. Burke had diagnosed the child as failure to thrive (Finding of Fact #167) which is not supported by the evidence; and further erred and disregarded test results showing no evidence that the child had OI (osteogenesis imperfecta) and had normal Vitamin D levels, by ordering genetic disorders testing, bone density disorders testing and follow levels, by ordering genetic disorders testing, bone density disorders testing and follow any and all recommendations in the Adjudication Order when the experts agree that EDS [Ehlers-Danlos Syndrome] has no test to identify it, and no metabolic disease or genetic disorders of the child have been diagnosed by the treating physicians.*

a. *Dr. Burke and the Failure to Thrive Diagnosis*

OYFS offered the testimony of Christine Burke, M.D., Minor Child's pediatrician at Scranton Primary Health Center as a fact witness. Dr. Burke treated Minor Child from birth and

testified that Minor Child had several medical issues over her first three months of life prior to OYFS involvement. 03/23/2017 Trans. at 199-219. One medical issue was a diagnosis of failure to thrive. Dr. Burke specifically testified to the diagnosis and treatment for failure to thrive as follows:

> Q. In your treatment of [Minor Child M.M.-A.], was she ever treated as a baby that was one labelled as failure to thrive?
>
> A. Yes, but it was difficult to distinguish because she was having so many mouth issues. I wasn't sure if that was contributing to her slow weight gain.

Id. at 212.

Additionally, Dr. Burke explained that she consulted with a pediatric hospitalist in the Geisinger system, Dr. Marks, regarding the failure to thrive, prior to Minor Child's placement with OYFS. Id. at 216, 278. As of December 7, 2016, Dr. Burke testified that Minor Child was still carrying the diagnosis of failure to thrive. Id. at 285. Based in part on Dr. Burke's testimony that Minor Child was diagnosed as failing to thrive and Mother and Father's failure to attend appointments, this Court found that Minor Child was without proper parental care or control. Dr. Burke's diagnosis of failure to thrive is supported by the record.

b. _Osteogenesis Imperfecta, Vitamin D Levels, and Ehlers-Danlos Syndrome_

If the child is found to be a dependent child, the Court may make additional orders best suited to the safety, protection and physical, mental, and moral welfare of the child. See 42 Pa. C.S.A. § 6351(a) (providing that the Court may permit the child to remain with her parent/guardian or transfer custody _subject to conditions and limitations_). Based on the evidence and testimony in the five-day hearing, this Court included a provision in the Adjudication Order that Minor Child be evaluated for genetic disorders and bone deficiency disorders and for Minor

Child's foster parents / kinship foster parents to follow any and all recommendations. See May 10, 2017 Order, ¶ 12(b).

OYFS raises the issue that Minor Child was found not to have osteogenesis imperfecta and had normal Vitamin D levels upon testing at Penn State Hershey Medical Center, as explained by Dr. Hymel. OYFS also argues that EDS has no test to identify it, and no metabolic disease or genetic disorders of the child have been diagnosed by the treating physicians.

This Court carefully considered Dr. Hymel's testimony and weighed his credibility. See Findings of Fact and Conclusions of Law, May 10, 2017 ¶¶ 60-104.

Dr. Hymel testified that he ruled out genetic disorders and disease as a cause of the fractures, including metabolic bone disease, rickets, and Vitamin D deficiency. 03/24/2017 Trans. at 66-68, 73-74. Dr. Hymel opined that Minor Child had normal bones and found nothing to suggest that there was something wrong with Minor Child's bones. Id. at 66, 151, 184. Dr. Hymel ordered a Connective Tissue Genetics Test, which was negative for osteogenesis imperfecta for Minor Child. Id. at 77. However, the negative test for osteogenesis imperfecta did not completely rule out the condition, according to Dr. Hymel. Id. at 182-184. Dr. Hymel also testified that loss of bone density may not be visible radiologically. Id. at 136.

Dr. Hymel also testified that he excluded EDS as a diagnosis for Minor Child. Id. at 74. However, Dr. Hymel stated he has not diagnosed EDS and would rely on geneticists and other experts regarding EDS. Id. at 37, 44. Dr. Hymel did not recall ever having a patient with EDS. Id. at 43.

In contrast, Mother and Father presented the testimony of Dr. Holick, Dr. Hyman, and Dr. Gootnick. This Court carefully considered the testimony of Dr. Hyman, Dr. Gootnick, and Dr. Holick and weighed their credibility. See Findings of Fact and Conclusions of Law, May 10,

2017 ¶¶ 105-151. Dr. Hyman opined that Minor Child had some type of bone fragility and that the high number of healing or occult fractures supported his opinion. 05/03/17 Trans. at 56-57. Dr. Gootnick testified that she observed evidence of rickets on Minor Child's radiological studies. 05/04/2017 Trans. at 18. Dr. Holick examined Mother and Father and diagnosed both with EDS hypermobility type 3, based on a review of clinical factors. 04/11/2017 Trans. at 44-49, 51-54. Dr. Holick opined that Minor Child had a 75% chance of having EDS. Id. While there may not be a specific genetic test to diagnose EDS hypermobility type 3, Dr. Holick's testimony identified one manner in which EDS may diagnosed through a history and physical examination.

Given the testimony of all the medical experts, including the treating physicians, this Court found it was warranted for Minor Child to be more fully evaluated for the genetic and bone density disorders that were discussed extensively by the medical experts in this case. OYFS's expert, Dr. Hymel, excluded several of these medical diagnoses during his treatment of Minor Child. This Court did not disregard Dr. Hymel's testimony. Rather, Dr. Hymel testified that he would defer to other specialists for the diagnosis of EDS and that the current testing for osteogenesis imperfecta does not totally rule out that condition. Dr. Holick diagnosed Mother and Father with EDS hypermobility type-3 based on clinical testing, not genetic testing, and opined that Minor Child had a 75% chance of having the condition. Out of concern for Minor Child's best interests and welfare, this Court found it warranted for further medical evaluations to be ordered out based on the medical evidence and testimony provided to this Court during these proceedings.

## 5) _Conclusion_

For all the above reasons, this Court granted OYFS's petition in part, finding that Minor Child M.M.-A. is a dependent child, but denied OYFS's petition in regard to a finding of child abuse against Mother V⁓ ⁓ A⁓ and Father A⁓ ⁓ M⁓ ⁓. Additionally, this Court ordered further measures regarding medical evaluations for Minor Child M.-M.A. that were appropriate and in her best interests.

BY THIS COURT:

_____, J.
HONORABLE JULIA K. MUNLEY

cc: Written notice of the entry of the foregoing Rule 1925(a) Opinion has been provided to each party pursuant to Pa. R. Civ. P. 236 (a) and (d) by transmitting time-stamped copies to:

Joseph Gardner Price, Esq.
Leigh Redmond, Esq.
**Lackawanna County Office of Youth and Family Services**
**Interdepartmental Mail**

Kevin O'Hara, Esq.
**Guardian ad Litem**
**Interdepartmental Mail**

Lori A. Barrett, Esq.
345 Wyoming Ave.
#1
Scranton, PA 18503
**Attorney for Mother**

Craig P. Kalinoski, Esq.
108 North Washington Ave.
Suite 604
Scranton, PA 18503
**Attorney for Mother**

Edward Blodnick, Esq.
1325 Franklin Ave.
Suite 555
Garden City, NY 11530
**Attorney for Mother** – _Pro Hac Vice_

George Gretz, Esq.
304 N Washington Ave.
Scranton, PA 18503
**Attorney for Father**